UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


**Sherilyn St. Louis**

   **v.**                                    Case No. 10-cv-00347-PB
                                         Opinion No. 2011 DNH 118
**Michael J. Astrue, Commissioner,**
**Social Security Administration**


MEMORANDUM AND ORDER


     Sherilyn St. Louis moves to reverse a decision of the
Commissioner of Social Security denying her application for
Disability Insurance Benefits ("DIB") under Title II of the
Social Security Act, 42 U.S.C. § 423 ("the Act").  The
Commissioner objects and moves for an order affirming the
decision.  For the reasons set forth below, I affirm the
Commissioner's decision.


I.  BACKGROUND[1]


A.  **Procedural History**

     On May 23, 2008, St. Louis filed an application for DIB,

---

[1] The background information is drawn from the Joint Statement of
Material Facts submitted by the parties (Doc. No. 13) and the
Administrative Record.  Citations to the Administrative Record
are indicated by "Tr."

alleging a disability onset date of July 10, 2007 due to bilateral knee osteoarthritis, bilateral torn menisci, morbid obesity, depression, and migraine headaches.  After her application was denied on August 13, 2008, St. Louis requested a hearing before an Administrative Law Judge ("ALJ").

On February 16, 2010, St. Louis, who was represented by counsel, appeared and testified before an ALJ.  On March 15, 2010, the ALJ issued his written decision and denied St. Louis's claim.  (Tr. 5).  The ALJ's decision was selected for review by the Decision Review Board of the Social Security Administration, and became final on June 16, 2010, when the Review Board affirmed the ALJ's decision.  (Tr. 1).  St. Louis now seeks judicial review of the ALJ's decision.  See 42 U.S.C. § 405(g).

B.   **Medical Evidence Before the ALJ**[2]

1.   July 2007 Right Knee Injury

On July 17, 2007, St. Louis went to the emergency room and reported that she had injured her knee the night before.  (Tr. 302-04).  She was diagnosed with a knee sprain and discharged in

_____

[2] The ALJ found that St. Louis had several severe impairments, which were bilateral knee injuries, morbid obesity, depression, and migraine headaches. (Tr. 11).  St. Louis's motion, however, focuses only on her bilateral knee injuries and morbid obesity. The discussion that follows addresses the medical evidence that relates to the impairments on which St. Louis bases her claim.

2

good condition.  (Tr. 304).  Three days later, St. Louis saw Dr. Laxmi Ramesh at her primary care center and described twisting her right knee.  (Tr. 279).  Examination of her right knee showed diffuse swelling, effusion,[3] and tenderness.  (Tr. 279). Dr. Ramesh wrote a note that excused St. Louis from work for one week while awaiting evaluation by an orthopedist.  (Tr. 281).

On July 25, 2007, St. Louis was seen by an orthopedist, Dr. Barry Bickley.  (Tr. 283).  Dr. Bickley noted that right knee x-rays from July 17, 2007 revealed significant osteoarthritis in all compartments and ordered an MRI.  (Tr. 283).  On September 6, 2007, Dr. Bickley observed that the MRI demonstrated a meniscus tear.  (Tr. 334).  On September 17, 2007, Dr. Bickley performed a right knee arthroscopy[4] with partial lateral meniscectomy.[5]  (Tr. 337).  Dr. Bickley's notes report that in the lateral compartment there was significant chondral[6] fraying,

---

[3] Effusion refers to increased fluid in the cavity of a joint. Stedman's Medical Dictionary ("Stedman's") 570 (27th ed. 2000).

[4] Arthroscopy refers to endoscopic examination of the interior of a joint.  See id. at 151.

[5] Meniscectomy refers to excision of a meniscus from the knee joint.  See id. at 1091.

[6] Chondral refers to cartilaginous.  See id. at 340.

grade four chondromalacia[7] of the lateral tibial plateau, and grade three changes of the lateral femoral condyle.[8]  (Tr. 338). At a follow up appointment with Dr. Bickley three days later, he noted that St. Louis was doing well and was no longer using any pain medication other than Motrin.  (Tr. 333).  She was using one crutch for ambulation.  (Tr. 333).  About a month later, Dr. Bickley noted at a follow up appointment that she was functioning quite well, with some residual swelling, and had full range of motion and no significant pain in the knee.  (Tr. 332).

On February 4, 2008, St. Louis had a physical at her primary care center.  (Tr. 311).  It was noted that she had a normal gait, with full range of motion in all joints and no musculoskeletal disability.  (Tr. 312, 314).  On May 21, 2008, St. Louis again visited her primary care center, this time complaining of pain in both knees, and was seen by Nancy Conway-Clancy, a Physician's Assistant.  (Tr. 306).  St. Louis reported that her knee pain had been persistent for a year and was

---

[7] Chondromalacia refers to softening of the cartilage.  See id. at 341.

[8] Condyle refers to a rounded articular surface at the extremity of a bone.  See id. at 397.

gradually worsening.  (Tr. 306).  The pain was moderate to
severe and was characterized as a dull aching which kept her
awake at night.  (Tr. 306).  Conway-Clancy noted that x-rays
indicated moderate to severe degenerative joint disease in both
knees.  (Tr. 307).  No swelling was noted, but both knees had
decreased range of motion and painful movements.  (Tr. 307).

On May 21, 2008, x-rays of both knees were obtained.  (Tr.
326-27).  They showed "tiny" osteophytes[9] involving the patella
in the left knee and "small" osteophytes involving the patella,
tibia, and femur in the right knee.  (Tr. 326-27).  Dr. Jeffrey
Chapdelaine, the reviewing physician, also noted subchondral[10]
sclerosis[11] and narrowing of the lateral compartment of St.
Louis's right knee.  (Tr. 330).

St. Louis started physical therapy on May 27, 2008 to
reduce her knee pain.  (Tr. 392).  The physical therapist noted
that they planned to see St. Louis two times per week for four
to six weeks.  (Tr. 392).  On June 18, 2008, St. Louis cancelled
all physical therapy appointments, per the advice of her doctor,

---

[9] An osteophyte is a bony outgrowth.  See id. at 1285.

[10] Subchondral refers to below the cartilage.  See id. at 1715.

[11] Schlerosis refers to the process of hardening.  See id. at
1604.

while undergoing a series of injections.  (Tr. 404).

On the same day, Conway-Clancy referred St. Louis to orthopedist Dr. Douglas Joseph.  (Tr. 350).  Dr. Joseph diagnosed osteoarthritis in both knees but noted that St. Louis's range of motion was fairly normal and that she had no significant injuries to her knees.  He recommended a Euflexxa[12] series.  (Tr. 350).  On June 20, 2008, St. Louis began the Euflexxa series based on Dr. Joseph's consult.  (Tr. 508).

On June 26, 2008, St. Louis saw Dr. Kalyani Eranki, a rheumatologist.  (Tr. 412).  Dr. Eranki noted that recent x-rays of St. Louis's knees showed osteoarthritic changes, which seemed premature given her youth.  (Tr. 414).  He remarked that she could have pattelofemoral[13] syndrome with premature osteoarthritis in her knees, and that her hypermobility[14] could

---

[12] Euflexxa is indicated to relieve knee pain due to osteoarthritis in "people who do not get enough relief from simple pain medications such as acetaminophen or from exercise and physical therapy."  Euflexxa Info. for Healthcare Profs., http://www.euflexxa.com/physician (last visited Jul. 13, 2011).

[13] Patellofemoral refers to pertaining to the patella and the femur.  Dorland's Illustrated Medical Dictionary 1415 (31st ed. 2007).

[14] Hypermobility refers to increased range of movement of joints and joint laxity.  See Stedman's at 851.

be contributing to her pain.  (Tr. 414).  At a follow-up

appointment with Dr. Eranki on August 11, 2008, he assessed that

St. Louis had possible seronegative[15] inflammatory arthritis,

which could be a combination of patellofemoral arthritis as well

as anserine bursitis.[16]  (Tr. 491).

On June 27, 2008, Conway-Clancy prepared a physical

capacities assessment.  (Tr. 352).  St. Louis's condition was

described as significant degenerative arthritis of both knees

with pain, and was deemed to be chronic.  (Tr. 352).  Conway-

Clancy opined that St. Louis was limited to part-time (four

hours of an eight-hour day) sedentary work three to five times

per week.  (Tr. 352).  Walking and standing were limited to

short five to thirty minute episodes spread over the day.  (Tr.

352).  St. Louis was capable of lifting up to ten pounds.  (Tr.

352).  She could occasionally bend from the waist, reach above

shoulder level, and twist at the waist, but should avoid

kneeling, crouching, climbing stairs, climbing ladders and

---

[15] Seronegative refers to the absence of an antibody usually
found in a given syndrome, e.g., rheumatoid arthritis without
rheumatoid factor.  See id. at 1623.

[16] Anserine bursitis is inflammation of the fluid sac between the
tibial collateral ligament of the knee joint and the tendons of
the surrounding muscles.  See id. at 259, 262.

scaffolds, and crawling.  (Tr. 353).  Finally, Conway-Clancy

opined that St. Louis was required to avoid hard floors, extreme

cold, wet or humid conditions, driving long distances, and had

to be in a situation where she could change positions

frequently.  (Tr. 353).

On August 11, 2008, state agency physician Dr. Jonathan

Jaffe reviewed the record available at the time and opined that

St. Louis could perform light work.  (Tr. 428).  He determined

that she could lift twenty pounds occasionally and ten pounds

frequently, stand or walk for a total of six hours per eight-

hour workday, and sit for a total of six hours per eight-hour

workday, with occasional climbing, balancing, stooping,

kneeling, crouching, and crawling.  (Tr. 422-23).

On August 13, 2008, Conway-Clancy prescribed physical

therapy for bilateral degenerative joint disease of the knee.

(Tr. 518).  Her notes indicate that St. Louis's symptoms showed

improvement with daily activities and nighttime pain, but that

St. Louis was still experiencing a lot of pain when standing for

a long time.  (Tr. 519).

    2.  September 2008 Left Knee Injury

On September 17, 2008, St. Louis visited her primary care

center, this time complaining of a left knee injury.  (Tr. 523).

Specifically, she stated that she had slipped and heard a

popping sound in her left knee.  (Tr. 523).  An MRI of her left

knee indicated a lateral meniscal tear, degenerative changes,

and a small popliteal fossa[17] cyst.  (Tr. 340).

St. Louis saw Dr. Heather Killie, an orthopedist, on

September 22, 2008.  (Tr. 357).  Dr. Killie diagnosed a lateral

meniscus tear with underlying degenerative joint disease.  (Tr.

357).  Dr. Killie noted that St. Louis had mechanical symptoms

consistent with her MRI findings and a difficult time with

ambulation.  (Tr. 357).  She planned to proceed with surgery,

and scheduled it for November 5, 2008.  (Tr. 357-58).

On October 31, 2008, a "Medical Source Statement of Ability

to do Work-Related Activities" was completed by Conway-Clancy.

(Tr. 433).  This evaluation was less restrictive than her first

evaluation, as it allowed St. Louis to work a full eight-hour

workday.  She advised that St. Louis should be limited to jobs

where she was allowed to take unscheduled breaks to relieve pain

and discomfort and that she would only be able to work under

---

[17] The popliteal fossa is the space posterior to the knee joint.
See id. at 708.

very specific conditions.  (Tr. 433).  Specifically, Conway-Clancy opined that St. Louis could never climb, balance, kneel, crouch, crawl, or stoop, and that long sitting, standing or walking would increase pain.  Thus, in sitting situations, St. Louis would have to get up every one to two hours to stretch her knees, and standing or walking was limited to less than two hours in an eight-hour work day.  (Tr. 430-31).  Conway-Clancy indicated that lifting/carrying as much as ten pounds could be done occasionally but not frequently.  (Tr. 430).

On November 5, 2008, Dr. Killie performed a left knee arthroscopy with partial lateral meniscectomy and chondroplasty[18] to correct St. Louis's torn left meniscus.  (Tr. 450).  Dr. Killie noted at a post-operative appointment on November 13, 2008 that St. Louis was doing well, and planned to send her to physical therapy.  (Tr. 361).

On November 18, 2008, St. Louis began physical therapy for her left knee.  (Tr. 373).  The physical therapist noted swelling, range of motion limitation and decreased quad control/strength.  (Tr. 373).  He opined that St. Louis could benefit from physical therapy to address these issues.  (Tr.

---

[18] Chondroplasty refers to reparative surgery of cartilage.  See id. at 342.

373).  A month later the physical therapist noted that she had
made significant progress with her left knee issues and was
steadily gaining strength.  (Tr. 376).  She continued to be
limited with functions however, due to issues with her right
knee.  (Tr. 376).  Continued treatment was recommended as well
as evaluation of the right knee.  (Tr. 376).

### 3.  2009 Right Knee Surgery

On December 18, 2008, St. Louis saw Dr. Killie for another
post-operative follow-up.  (Tr. 364).  St. Louis reported she
had no pain in her left knee, but she had increasing pain in her
right knee.  (Tr. 364).  An MRI of her right knee showed
degenerative changes in the knee, most extensively laterally,
where there was narrowing of the joint space and extensive
thinning of the cartilage at both the tibial and femoral
surfaces.  (Tr. 347).  The posterior horn of the lateral
meniscus was quite small and deformed, but the configuration was
more suggestive of post-operative change than an acute tear.
(Tr. 347-48).  On January 2, 2009, when St. Louis saw Dr. Killie
for an MRI follow-up appointment, she reported that her right
knee was still problematic.  (Tr. 365).  Walking was not a
problem, but she was unable to use stairs or kneel.  (Tr. 365).

11

Dr. Killie recommended physical therapy, anti-inflammatories, and an arthroscopy.  (Tr. 365).  At an appointment on January 5, 2009, it was noted that St. Louis's gait was normal, but her ability to exercise was limited by her knee injuries.  (Tr. 526-27).

On January 21, 2009, Dr. Killie performed a right knee arthroscopy with partial lateral meniscectomy and removed damaged cartilage.  (Tr. 456).  At a post-operative appointment nine days later, Dr. Killie ordered physical therapy for range of motion restoration and strengthening of the right knee.  (Tr. 369).  She also advised that St. Louis would do better with a weight loss program after her knee was feeling better.[19]  (Tr. 369).

---

[19] St. Louis stands 5'9" tall, and at the time of her knee injury in July 2007 she weighed 332 pounds.  (Tr. 279).  On June 11, 2009, St. Louis saw Dr. Donald Hess in consultation for weight loss surgery.  (Tr. 575).  He noted a longstanding history of morbid obesity and assessed St. Louis as an excellent candidate for the surgery based on a body mass index of 50.6.  (Tr. 576).  On August 5, 2009, St. Louis saw Dr. Lalita Khaodhiar for a preoperational weight loss surgery evaluation, and reported she was exercising four to five times per week.  (Tr. 582).  Dr. Khaodhiar's impression was that St. Louis suffered from obesity, knee osteoarthritis, and depression, but she noted normal mobility.  (Tr. 584-85).  St. Louis was scheduled to undergo weight loss surgery in February 2010.  The record does not indicate whether or not the surgery was performed. (Tr. 38).

St. Louis began physical therapy again on February 3, 2009 for her right knee.  (Tr. 380).  She exhibited decreased range of motion and strength with typical post-operative swelling. (Tr. 380).  On February 9, 2009, it was noted during a physical that St. Louis's gait was normal.  (Tr. 529).  A physical therapy re-evaluation was done on March 3, 2009, at which time St. Louis reported that her right knee was starting to "feel better."  (Tr. 383).  Functionally she was not able to squat, use stairs, or kneel due to pain, but she was taking short steps and was "able to walk community distances."  (Tr. 383).

### 4.  2009 Left Knee Injury

On March 16, 2009, St. Louis saw Dr. Killie for a second post-operative appointment.  (Tr. 371).  She reported that her right knee was "doing much better," but her left knee pain was increasing.  (Tr. 371).  She had slipped and fallen on water a week before and hyperextended her left knee.  (Tr. 371).  Dr. Killie ordered physical therapy for both knees.  (Tr. 371).

On March 24, 2009, St. Louis told the physical therapist that she felt "really good."  (Tr. 386).  It was noted that she had made excellent progress in physical therapy and had achieved most of her physical therapy goals, including the ability to go

up and down a flight of stairs.  (Tr. 384, 386).  At a follow-up appointment with Dr. Killie on April 6, 2009, St. Louis reported that both knees were becoming "achier," but that the pain in her left knee had gone away with therapy.  (Tr. 372).  Dr. Killie also noted that they talked about potential lap band surgery and weight loss, and how this could diminish her pain.  (Tr. 372).  Dr. Killie also wanted to proceed with Euflexxa injections.  (Tr. 372).  St. Louis saw Conway-Clancy throughout the next few months for Euflexxa injections in her knees.  (Tr. 535, 538, 541, 544, 547, 550).

On May 26, 2009, St. Louis saw Dr. Jie Cheng, a specialist in Rehabilitation at Pain Solutions, for a consultation regarding her bilateral knee pain.  (Tr. 494).  She reported that the pain was exacerbated by standing or walking, and somewhat relieved by hot showers or baths.  (Tr. 494).  Dr. Cheng noted that St. Louis's knee range of motion was normal.  (Tr. 495).  She assessed arthralgia[20] of the knee, and referred her for chronic pain management.  (Tr. 495).

On July 13, 2009, at a follow-up with Conway-Clancy after the Euflexxa shots, St. Louis noted improvement in her overall

---

[20] Arthralgia refers to pain in a joint.  See id. at 149.

14

knee pain and described the pain as mild to moderate.  (Tr.
553).  Her right side was still more painful than the left, but
she stated that she had joined a gym and was working out.  (Tr.
553).  An examination showed no pain and full range of motion of
the knees bilaterally.  (Tr. 554).

On August 24, 2009, St. Louis visited her primary care
center after starting a new diet and exercise program, and it
was noted that her gait was normal.  (Tr. 555-56).  She returned
on October 14, 2009, after dropping a weight on her foot, and
once again her gait was recorded as normal.  (Tr. 566-67).  St.
Louis visited her primary care center on November 18, 2009 and
reported recurrent knee pain.  (Tr. 571).  She presented with
disturbance of gait, decreased range of motion, and joint pain
in both knees.  (Tr. 571).  She reported that the medication she
had taken to relieve the pain was causing her headaches, but she
was still riding an exercise bike.  (Tr. 571).  Conway-Clancy
noted she had been doing very well with exercise and weight
loss.  (Tr. 571).

## C.    **Hearing Testimony**

At the administrative hearing on February 16, 2010, St.

Louis testified about her previous employment[21] and her history of knee problems and surgeries.  She noted that she could stand in one spot for about fifteen or twenty minutes, but that walking was more difficult.  (Tr. 45).  She testified she could walk for about thirty minutes and anything more would put her "over for the whole day."  (Tr. 45).  Elaborating further, she stated that she could walk about a quarter to half a block before she had to stop, sit down, or rest in some way.  (Tr. 50).  She also explained that her knees would get stiff when she rested, causing pain and difficulty walking as soon as she got up.  (Tr. 46).   Finally, she testified to problems walking on rough or uneven surfaces, and noted that when climbing stairs she had to hold on to the railing and take one step at a time. (Tr. 50).  St. Louis also explained her daily routine.  She noted that while her two children are at school she cleans up as much as she can, does laundry, and rests frequently, but that she is unable pick up her three-year-old son.  (Tr. 48-49).

St. Louis also indicated that she suffers from migraine

_____

[21] Her past relevant work includes time spent as an office assistant, a case worker in human services, a cashier, a hair stylist, and as a reservation clerk.  (Tr. 40-42).  She left her most recent job as a residential counselor for mentally ill individuals because she felt like she could not fully protect herself due to the condition of her knees.  (Tr. 40-41).

headaches.  (Tr. 49).  The migraines occur once every three
weeks to a month and they last for three days in a row.  (Tr.
50).  She takes Motrin or something similar to deal with the
migraines.  (Tr. 50).  When the migraines occur, she is able to
function in a limited way, but has to make sure that she can lie
down and rest.  (Tr. 50).  Finally, she told the ALJ that she
has trouble falling asleep and is frequently awakened by her
knee pain.  (Tr. 52).

    After hearing St. Louis's testimony, the ALJ posed three
hypothetical questions to a vocational expert ("VE").  (Tr. 54-
56).  In the first hypothetical, the ALJ asked the VE to assume
that the plaintiff had the Residual Functional Capacity ("RFC")
to perform sedentary work.[22]  (Tr. 54).  The ALJ then asked if
the hypothetical claimant would be able to perform any of her
past relevant work either as actually performed, or as generally
performed in the national economy.  (Tr. 55).  The expert

---

[22] This would require a person to stand uninterrupted for about
twenty minutes, walk uninterrupted for approximately thirty
minutes with no particular limitations on sitting, stand and
walk for about two hours in an eight-hour day, and sit for about
six hours in an eight-hour day.  The hypothetical claimant would
also be restricted from climbing ladders, kneeling and crawling,
and would need to avoid uneven surfaces, but would otherwise be
able to occasionally engage in balancing, stooping, crouching,
and climbing stairs.  (Tr. 54-55).

17

explained that she would be able to perform her past work as a reservations clerk.  (Tr. 55).

For the second hypothetical, the ALJ asked the expert to assume the first hypothetical but added that the claimant would be limited to simple, routine, and repetitive tasks at least several times per month for the days when she was suffering from migraines or general pain.  (Tr. 55).  The VE felt that the claimant would not be able to perform St. Louis's past relevant work as a reservations clerk because it was classified as skilled.  (Tr. 55).  With regard to unskilled jobs, the VE identified several unskilled jobs available in the national economy that would fit the hypothetical.[23]  (Tr. 56).

For the third hypothetical, the ALJ asked the expert to assume the same hypothetical as the second, but added that the claimant would be limited to jobs where she could be absent unpredictably from work up to three times per month because of exacerbations of either headaches or pain.  (Tr. 56).  The

---

[23] Specifically, the VE identified "call out operator" (50 jobs available in the local economy and 10,000 in the national economy), "food and beverage clerk" (75 jobs in the local economy and 17,000 in the national economy), "telephone quotation clerk" (350 jobs in the local economy and 90,000 in the national economy), and "assembler" (175 jobs in the local economy and 60,000 in the national economy).  (Tr. 56).

expert felt that there were no available jobs that such a claimant could perform.  (Tr. 56).

**D.   ALJ's Analysis**

The ALJ employed the five-step sequential evaluation process established by the Social Security Administration to determine whether St. Louis was disabled.  (Tr. 9-10); see 20 C.F.R. § 404.1520(a).  At the first step, the ALJ found that St. Louis had not engaged in substantial gainful activity since her application date.  (Tr. 10); see 20 C.F.R. § 404.1520(a)(4)(i). At the second step, the ALJ found that St. Louis's bilateral knee injuries, morbid obesity, depression, and migraine headaches constituted severe impairments.[24]  (Tr. 11); see 20 C.F.R. § 404.1520(a)(4)(ii).  At the third step the ALJ determined that St. Louis's impairments neither met nor equaled an impairment enumerated in the listings.  (Tr. 12); see 20 C.F.R. § 404.1520(a)(4)(iii).  The ALJ then determined that St. Louis retained the RFC to perform sedentary work as long as she had an opportunity to alternate positions frequently, with no climbing of ladders, kneeling, or crawling.  (Tr. 13).  She

---

[24] Although the ALJ found that St. Louis's depression was a severe impairment, he also determined that it was under reasonable control with therapy.

would need to avoid uneven surfaces and up to three days monthly

would be limited to simple, routine, and repetitive tasks due to

her depression, pain and headaches.  (Tr. 13); see 20 C.F.R. §

404.1520(e).  At the fourth step the ALJ found that St. Louis

could not perform any of her past relevant work in light of her

RFC.  (Tr. 15); see 20 C.F.R. § 404.1520(a)(4)(iv).  At the

fifth step, the ALJ relied on testimony from the VE in

determining that there were jobs available in significant

numbers in the national economy that St. Louis could perform.

(Tr. 16-17); see 20 C.F.R. § 404.1520(a)(4)(v).

## II.  <u>STANDARD OF REVIEW</u>

The Social Security Act provides that "[a]ny individual,

after any final decision of the Commissioner of Social Security

made after a hearing to which he was a party, . . . may obtain a

review of such decision by a civil action." 42 U.S.C. § 405(g).

I am empowered to "enter, upon the pleadings and transcript of

the record, a judgment affirming, modifying, or reversing the

decision of the Commissioner of Social Security, with or without

remanding the cause for a rehearing."  See <u>id.</u>

My "review is limited to determining whether the ALJ

deployed the proper legal standards and found facts upon the
proper quantum of evidence." Nguyen v. Chater, 172 F.3d 31, 35
(1st Cir. 1999)(per curiam).  The Commissioner's findings of
fact are conclusive when supported by substantial evidence.  42
U.S.C. § 405(g); Ortiz v. Sec'y of Health & Human Servs., 955
F.2d 765, 769 (1st Cir. 1991)(per curiam).  "Substantial
evidence is more than a mere scintilla.  It means such relevant
evidence as a reasonable mind might accept as adequate to
support a conclusion." Consol. Edison Co. v. NLRB, 305 U.S.
197, 229 (1938).  In reviewing the record for substantial
evidence, I give deference to the ALJ's findings, as it is his
responsibility, not the court's, to determine issues of
credibility and to draw inferences from evidentiary facts.
Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222
(1st Cir. 1981).  The ALJ's findings are not conclusive,
however, if they are "derived by ignoring evidence, misapplying
the law, or judging matters entrusted to experts." Nguyen, 172
F.3d at 35.

### III.  ANALYSIS

St. Louis seeks reversal of the ALJ's decision on three

grounds.  First, she challenges the ALJ's step-three determination because she contends that he failed to consider the effects of her obesity when determining whether her impairments met one of the listings.  Second, St. Louis argues that the ALJ's RFC determination misapprehended the importance of her obesity and pain, was not consistent with her treating source's opinion, and arbitrarily confined further limitations to three days per month.  Finally St. Louis claims that the ALJ failed to prove that there are jobs that exist in significant numbers in the national economy that St. Louis could perform. I will address each argument in turn.

## A.   <u>The ALJ's Listing Determination</u>

At the third step of the evaluation process, the ALJ must consider whether any of the claimant's severe impairments meet or equal one of the impairments listed in 20 C.F.R. Part 404, Subpart P, App. 1.  If an impairment does not meet the criteria of a listing on its own, it can medically equal the criteria of the listing if the claimant has other findings related to her impairment that are at least of equal medical significance to the required criteria for the listing.  20 C.F.R. §§ 404.1525(c)(5), 404.1526(b)(1)(ii).

22

Listing § 1.02 addresses "major dysfunction of a joint(s)." 20 C.F.R. Part 404, Subpart P, App. 1, § 1.02.  It characterizes major dysfunction of a joint as:

> [G]ross anatomical deformity . . . and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis[25] of the affected joint(s).  With:
>
> (A) Involvement of one major peripheral weight-bearing joint . . ., resulting in inability to ambulate effectively . . . .

Id.

St. Louis argues that the ALJ's determination at step three failed to follow section 1.00Q of the listing, which counsels that "adjudicators must consider any additional and cumulative effects of obesity" on musculoskeletal impairments, as "[t]he combined effects of obesity with musculoskeletal impairments can be greater than the effects of each of the impairments considered separately."  See 20 C.F.R. Part 404, Subpart P, App. 1, § 1.00Q; see also Social Security Ruling ("SSR") 02-1p, 2000 WL 628049, *5 (Sep. 12, 2002) (elaborating on the consideration of obesity in the sequential evaluation process).

---

[25] Ankylosis refers to stiffening or fixation of a joint as the result of a disease process, with fibrous or bony union across the joint.  See Stedman's at 90.

Contrary to St. Louis's claims, the ALJ did consider the impact of her obesity on her knee problems when considering whether she met the requirements of the listing for joint dysfunction.  (Tr. 12).  He also commented repeatedly on the impact of her obesity on her alleged impairments.  In determining St. Louis's RFC, the ALJ noted that "the record . . . reflects that [her] knee pain was aggravated by her longstanding morbid obesity."  (Tr. 11).  He specifically mentioned her height, her consistent excessive weight, and that ongoing weight loss was encouraged to help diminish her knee pain.  (Tr. 11-12).  He also noted St. Louis's observation that she had experienced a significant decrease in knee pain after losing twenty pounds a year earlier.  (Tr. 12).  Because the ALJ considered the effects of St. Louis's obesity on the musculoskeletal system as required by § 1.00Q of the listing, St. Louis's argument fails.

St. Louis next argues that the ALJ's conclusion that she was able to ambulate effectively was not supported by substantial evidence.  "To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily

living."[26] 20 C.F.R. Part 404, Subpart P, App. 1, §

1.00(B)(2)(b).  St. Louis points to four examples from the

record where medical professionals noted disturbance of gait or

use of a crutch, as well as her testimony before the ALJ

indicating that she had difficulty with uneven surfaces and

stairs. (See Tr. 50-51, 306-308, 333, 357, 571).  The record,

however, also contains substantial evidence demonstrating St.

Louis's ability to ambulate effectively, and it is the ALJ's

responsibility to resolve factual conflicts in the record.  See

Ortiz, 955 F.2d at 769.

    At her physical on February 4, 2008 St. Louis had a normal

gait with full range of motion in all joints, and no

musculoskeletal disability.  (Tr. 312, 314).   On March 24,

2009, the physical therapist noted that she was able to go up

and down a flight of stairs, and could walk "community

distances."  (Tr. 384, 386).  On August 5, 2009 St. Louis had a

---

[26] St. Louis also argues that the ALJ defined "inability to
ambulate effectively" too narrowly, as requiring an "abnormal
gait," when he stated "that the claimant is able to ambulate
with a normal gait."  However, the ALJ was not purporting to
define "ambulate effectively" when he referenced medical
evidence showing that St. Louis had a normal gait.  He was
merely citing appropriate evidence of St. Louis's ambulatory
capabilities, which he then applied to the correct standard in
reaching his conclusion that her knee problems did not meet or
equal the level of severity described in § 1.02A.  (Tr. 12).

preoperational surgery evaluation for weight loss surgery, and it was noted that she had normal mobility.  (Tr. 582, 584).  On October 14, 2009, St. Louis visited her primary care center after dropping a weight on her foot, and it was noted that there was no disturbance of gait and her gait was normal.  (Tr. 566-67).

The ALJ's written order also addresses St. Louis's activities of daily living, specifically noting that she takes her daughter to and from school, takes care of housekeeping chores, leaves home daily, and is able to drive a car.  (Tr. 13).  The record also indicates that physical therapy improved St. Louis's knee pain, and that she was able to work out at a gym.  (Tr. 11).  These examples, combined with the evidence in the medical record, illustrate that the ALJ appropriately concluded that St. Louis was capable of ambulating effectively. As a result, substantial evidence supports the ALJ's determination that St. Louis's knee problems did not meet or equal the level of severity described in § 1.02A.

**B.    RFC Determination**

St. Louis next argues that the ALJ made three significant errors in his determination of her RFC.  First, she contends

26

that the ALJ did not adequately consider either the compounding effect of her obesity on her musculoskeletal system or her reports of pain.  Next, she argues that the ALJ did not give sufficient weight to a treating source's opinion.  Finally, she claims that the ALJ's decision to further restrict her RFC to simple, routine, and repetitive tasks up to three days per month was determined arbitrarily.

     1.  <u>The ALJ's Consideration of Obesity and Pain</u>

St. Louis argues that the ALJ misapprehended the effects of her obesity and pain on her functional limitations in his determination of her RFC.

Contrary to St. Louis's assertion, the ALJ did effectively consider the effects of her obesity on her musculoskeletal problems when determining her RFC.  This argument is identical to the argument St. Louis makes regarding the ALJ's evaluation at step three, as SSR 02-1p requires the ALJ to consider the combined effects of obesity with other impairments both when evaluating whether an impairment equals a listing and when determining the RFC.  As I previously discussed in the step three analysis, the record demonstrates that the ALJ gave due consideration to St. Louis's obesity in evaluating her claims.

See supra Part III.A.

St. Louis also claims that the ALJ improperly discounted her reports of pain in his RFC determination.  In evaluating the intensity and persistence of St. Louis's symptoms, the ALJ considers all of the available evidence from the record.  See 20 C.F.R. § 404.1529(c)(1).  ALJs may conclude that a claimant's allegations of subjective pain are not supported by evidence from the record, such as medical evidence and testimony of daily activities.  See Da Rosa v. Sec'y of Health & Human Servs., 803 F.2d 24, 26 (1st Cir. 1986)(per curiam); Guerin v. Astrue, No. 10-cv-421-SM, 2011 WL 2531195, at *7 (D.N.H. June 24, 2011).  Such assessments are ordinarily made by the ALJ rather than the court.  Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d 192, 195 (1st Cir. 1987)(per curiam).

In this case, the ALJ concluded that St. Louis's statements concerning the intensity, persistence and limiting effects of her symptoms were not entirely credible.  (Tr. 15).  Substantial evidence supports this decision.  The ALJ noted that while St. Louis reported experiencing frequent knee pain, she was not taking any pain medication, suggesting that "her pain, while no doubt bothersome, [wa]s tolerable."  (Tr. 15); see Ortiz, 955

F.2d at 769 (accepting the ALJ's inference that claimant would have secured more treatment had his pain been as intense as alleged).  The ALJ also relied on the fact that St. Louis used the gym three to four times per week, including riding a bicycle and weightlifting.  (Tr. 15); see Guerin, 2011 WL 2531195 at *5,*7 (finding no error in ALJ's assessment of claimant's credibility when activities of daily living were not consistent with purported pain).  It was within the ALJ's discretion to conclude from these findings that, although the plaintiff suffered pain as reflected in the medical records and in her testimony, the degree of pain was not as severe as St. Louis claimed.

   2. The ALJ's Consideration of the Treating Source's Opinion

St. Louis next alleges that the ALJ did not give adequate weight to the opinion of Conway-Clancy, a treating Physician's Assistant, when determining her RFC.  Conway-Clancy prepared two physical capacity assessments, one in June 2008 and one in October 2008.  (Tr. 352-53, 430-33).  The June assessment is more restrictive than the October assessment.[27]  The ALJ largely

---

[27] The June assessment limited St. Louis to four hours of work during an eight-hour day, while the October assessment allowed St. Louis to work a full eight-hour workday.

adopted the October opinion[28] when he determined that St. Louis

had the RFC

> [T]o perform sedentary work allowing for an opportunity to
> alternate positions at will frequently, with no climbing of
> ladders, kneeling or crawling.  [St. Louis] would be able to
> otherwise perform postural activities occasionally. She
> would need to avoid uneven surfaces and up to three days
> monthly would be limited to simple, routine and repetitive
> tasks due to her depression, pain and headaches.

(Tr. 13).  Given the contradictory nature of the two reports,

the ALJ had no choice but to give one more weight than the

other.  Considering all of the evidence, including the medical

record and activities of daily living that I have already

discussed, here the ALJ made the reasonable decision to follow

Conway-Clancy's October assessment over her June assessment.

Therefore, in light of the record as a whole, there is

substantial evidence that the ALJ appropriately considered

Conway-Clancy's opinion.

### 3. The Three-Day-Per-Month Limitation

The ALJ determined that St. Louis was limited to simple,

---

[28] The only element of Conway-Clancy's opinion from October 31,
2008 that is absent from the ALJ's RFC determination is her
suggestion that St. Louis should be allowed to take unscheduled
breaks.  (Tr. 433).  This recommendation by Conway-Clancy was
expressly phrased as an "advisement," not a requirement.  (Tr.
433).

routine, and repetitive tasks up to three days monthly due to her depression, pain, and headaches.  (Tr. 13).  St. Louis contends that this limitation is arbitrary and not supported by any medical evidence in the record.

     As the ALJ noted, St. Louis's migraines were not mentioned in the medical record other than as a factor regarding her decision to stop taking pain medications.  (Tr. 15). Nevertheless, the ALJ credited St. Louis's testimony at the hearing that she gets migraine headaches once every three weeks to a month and that they last for three days.  (Tr. 15, 50). Thus, far from being arbitrary, the ALJ based his three-day limitation on St. Louis's own hearing testimony.  As for the ALJ's decision to incorporate St. Louis's depression and pain into the three-day limitation, the medical record showed St. Louis's depression was under reasonable control with therapy, her pain was tolerable, and there was no specific impairment in St. Louis's ability to concentrate.  Given the paucity of medical evidence and the fact that the three-day limitation was based on St. Louis's own testimony, the ALJ's determination was supported by substantial evidence in the record.

**C.**   **Step-Five Determination**

At step five of the disability determination process, the burden shifts to the Commissioner to establish that the claimant can engage in alternate employment and that such employment exists in "significant numbers in the national economy."  See 42 U.S.C. § 423(d)(2)(A); Geoffroy v. Sec.'y of Health & Human Servs., 663 F.2d 315, 317 (1st Cir. 1981).  St. Louis contends that the ALJ's step-five determination was not supported by substantial evidence because the number of available jobs listed by the VE was not a "significant number."

There is no bright line test establishing the number of jobs necessary to constitute a "significant number," and each case should be evaluated on its individual merits.  Johnson v. Barnhart, 402 F.Supp.2d 1280, 1284 (D. Kan. 2005).  Ultimately, the ALJ must weigh the facts of each case and apply them to the statutory language, using common sense to make a decision.  See id.

In this case the VE testified as to the availability of jobs suited to a person of St. Louis's age, education, work experience, and RFC in response to hypotheticals posed by the

ALJ and St. Louis's attorney.[29] (Tr. 55-57).  Specifically, the
VE identified "call out operator" (50 jobs in the local economy
and 10,000 in the national economy), "food and beverage clerk"
(75 jobs in the local economy and 17,000 in the national
economy), "telephone quotation clerk" (350 jobs in the local
economy and 90,000 in the national economy), and "assembler"
(175 jobs in the local economy and 60,000 in the national
economy), as jobs available to a person with limitations similar
to St. Louis's.  (Tr. 56).

Aggregating the jobs identified by the VE, St. Louis argues
that 650 jobs in the local economy and 177,000 jobs nationally
are insufficient to constitute significant numbers.  I disagree,
as other courts have determined that even fewer jobs can qualify
as a significant number of jobs.  See, e.g., Jenkins v. Bowen,
861 F.2d 1083, 1087 (8th Cir. 1988)(500 jobs in region was a
significant number); McCallister v. Barnhart, No. 03-189-P-S,
2004 WL 1918724, at *5 (D. Me. Aug. 26, 2004)(372 jobs in a

---

[29] The VE's numbers denote all the available jobs St. Louis would
be capable of, not just a representative sample. St. Louis
argues that the ALJ's reference in his decision to
"representative jobs" indicates he may have assumed there were
more jobs available than those specifically named by the VE.
This argument has no bearing on my decision, however, since I
find that the number of jobs named by the VE is enough to be
significant in either case.

region and 50,955 in the national economy were significant numbers).  Therefore the ALJ met his burden of proving that there are jobs St. Louis can perform with her RFC, and that such employment exists in significant numbers in the national economy.[30]

## IV.  CONCLUSION

The ALJ's decision is supported by substantial evidence in the record.  The defendant's motion for an order affirming the decision of the Commissioner (Doc. No. 12) is granted, and St. Louis's motion to reverse (Doc. No. 9) is denied. Accordingly, the clerk shall enter judgment and close the case.

SO ORDERED.

/s/Paul Barbadoro
Paul Barbadoro
United States District Judge

July 27, 2011

cc:  Janine Gawryl, Esq.
     Robert Rabuck, Esq.

---

[30] Finally, St. Louis argues that the ALJ's step-five finding was improper because the VE testified that there would not be any jobs available if the individual were required to be absent three times monthly rather than merely limited to simple, routine, repetitive work three times monthly.  This testimony is of no consequence because the ALJ did not ultimately find that St. Louis was so limited.  (Tr. 13).